No. 25-10491

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
    Plaintiff-Appellee,

SARAH BUDD,
    Intervenor Plaintiff-Appellee,

v.

SKYWEST AIRLINES, INCORPORATED,
    Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Texas

RESPONSE BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS PLAINTIFF-APPELLEE

CATHERINE ESCHBACH
Acting General Counsel

CHRISTOPHER LAGE
Deputy General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

JAMES DRISCOLL-MACEACHRON
Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(602) 661-0014
james.driscoll-maceachron@eeoc.gov

## STATEMENT REGARDING ORAL ARGUMENT

The EEOC believes oral argument is unnecessary because the jury verdict is well supported by the evidence and the district court's legal rulings are correct. Nevertheless, the EEOC does not oppose oral argument if it would assist the Court.

## CERTIFICATE OF INTERESTED PERSONS

(1) *EEOC v. SkyWest Airlines, Inc.*, No. 25-10491

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Budd, Sarah, Intervenor Plaintiff-Appellee

Driscoll-MacEachron, James, Attorney, EEOC

Drumm, Liz E., Counsel for Defendant-Appellant

Equal Employment Opportunity Commission, Plaintiff-Appellee

Eschbach, Catherine, Acting General Counsel, EEOC

Goldstein, Jennifer, Associate General Counsel, EEOC

Henry, Ann, Acting Assistant Regional Attorney, EEOC

Lage, Christopher, Deputy General Counsel, EEOC

Lang, Alexa, Trial Attorney, EEOC

Lopez, Brooke, Trial Attorney, EEOC

Mann, John Roger, Counsel for Defendant-Appellant

ii

Shultz, Chad A., Counsel for Defendant-Appellant

SkyWest Airlines, Defendant-Appellant

Smith, Dara S., Assistant General Counsel, EEOC

Thomas, Edith, Attorney, Counsel for Intervenor Plaintiff-Appellee

Ronald Phillips, Acting Regional Attorney, EEOC

Respectfully,

s/ James Driscoll-MacEachron
JAMES DRISCOLL-MACEACHRON
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(602) 661-0014
james.driscoll-maceachron@eeoc.gov

Dated: December 17, 2025

# TABLE OF CONTENTS

Statement Regarding Oral Argument ................................................................. i

Certificate of Interested Persons ...................................................................... ii

Table of Authorities .......................................................................................vii

Statement of Jurisdiction ..................................................................................1

Statement of the Issues ....................................................................................1

Statement of the Case .......................................................................................1

    A. Course of Proceedings ............................................................................1

    B. Statement of the Facts ............................................................................2

    C. District Court's Decision.......................................................................12

Standard of Review.........................................................................................13

Summary of Argument ...................................................................................13

Argument ........................................................................................................15

    I. SkyWest did not make the difficult showing necessary for a new
    trial based on evidentiary objections. ........................................................15

        A. Standard of Review.........................................................................15

        B. The district court did not abuse its discretion in admitting the
        challenged exhibits.........................................................................16

        C. Any error in admitting the text message exhibits did not
        affect SkyWest's substantial rights. ............................................21

            1. The texts were admissible on other grounds..................................22

            2. The texts were cumulative of other evidence.................................23

        D. Brief comments in the closing arguments do not show an
        error that affected SkyWest's substantial rights.........................27

    II. The district court appropriately rejected SkyWest's novel
    failure-to-mitigate emotional distress instruction. ......................................30

A.    The instruction SkyWest sought was inconsistent with the statutes and the pattern instructions. ........................................................31

    1.    Title VII provides a failure-to-mitigate defense for backpay but not for emotional distress damages. .................................................32

    2.    This Court's pattern instructions provide a failure-to-mitigate defense for Title VII backpay, but not for Title VII emotional distress damages. ..................................................................35

B.    SkyWest misapplies an interpretative canon to urge a new defense for Title VII emotional distress damages. .....................................37

    1.    The interpretative canon permitting courts to infer that Congress implicitly incorporated a well-established common law principle in a federal statute is narrow................................................37

    2.    SkyWest does not identify a common law rule that fits within the interpretative canon. ...........................................................40

C.    SkyWest's proposed rule is inconsistent with this Court's precedents and unnecessary to ensure reasonable awards. .....................45

III.  SkyWest did not show that the jury's punitive damages award should be discarded. ........................................................................50

    A.    Standard of Review........................................................................50

    B.    Punitive damages standard ............................................................52

    C.    The jury could reasonably infer that SkyWest acted with malice or reckless indifference to Budd's federally protected rights.....52

        1.    The jury could find Hansen acted with malice or reckless indifference. .................................................................................53

        2.    The jury could find that Widmer acted with malice or reckless indifference. ........................................................................55

        3.    The jury could find that Dehais acted with malice or reckless indifference. .................................................................................56

    D.    SkyWest did not preserve its good faith defense or meet the high standard for using the defense to set aside the jury's verdict........58

Conclusion .................................................................................................. 62

Certificate of Compliance ........................................................................ 64

Certificate of Service ................................................................................ 65

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abner v. Kansas City S. R. Co.*,
513 F.3d 154 (5th Cir. 2008)................................................................48, 50

*Adams v. Mem'l Hermann*,
973 F.3d 343 (5th Cir. 2020)...........................................................13, 16, 31

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)...................................................................................34

*Astoria Federal Savings & Loan Association v. Solimino*,
501 U.S. 104 (1991)....................................................................37, 38, 39, 40

*Beran v. VSL N. Platte Ct. LLC*,
144 F.4th 1007 (8th Cir. 2025)....................................................................56

*Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*,
75 F.3d 1048 (5th Cir. 1996).......................................................................24

*Castagna v. Luceno*,
558 F. App'x 19 (2d Cir. 2014) ...................................................................47

*Chuy v. Phila. Eagles Football Club*,
431 F. Supp. 254 (E.D. Pa. 1977), *aff'd*, 595 F.2d 1265 (3d Cir.
1979) (en banc) .........................................................................................44

*United States ex rel. Colquitt v. Abbott Lab'ys*,
858 F.3d 365 (5th Cir. 2017)..................................................................13, 30

*David H. v. Spring Branch Indep. Sch. Dist.*,
569 F. Supp. 1324 (S.D. Tex. 1983) ...........................................................44

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*,
188 F.3d 278 (5th Cir. 1999)..................................................................52, 60

*Deters v. Equifax Credit Info. Servs., Inc.,*
    202 F.3d 1262 (10th Cir. 2000) ................................................................55, 56, 57

*Dohmann v. Richard,*
    282 So.2d 789 (La. Ct. App. 1973) ........................................................42

*Echeverry v. Jazz Casino Co.,*
    988 F.3d 221 (5th Cir. 2021) ..................................................................16

*EEOC v. Boh Bros. Const. Co.,*
    731 F.3d 444 (5th Cir. 2013) (en banc)................................................51, 52, 56

*EEOC v. Chris the Crazy Trader Inc.,*
    No. 21-CV-02666, 2025 WL 958486 (D. Colo. Mar. 31, 2025) .....................47

*EEOC v. Fed. Express Corp.,*
    513 F.3d 360 (4th Cir. 2008) ..................................................................53

*EEOC v. Mgmt. Hosp. of Racine, Inc.,*
    666 F.3d 422 (7th Cir. 2012)...................................................................60

*EEOC v. New Breed Logistics,*
    783 F.3d 1057 (6th Cir. 2015).................................................................52, 61

*EEOC v. SDI of Mineola, Tex., LLC,*
    631 F. Supp. 3d 418 (E.D. Tex. 2022)..........................................34, 40, 43, 47

*EEOC v. Serv. Temps Inc.,*
    679 F.3d 323 (5th Cir. 2012)...................................................................54

*Ford Motor Co. v. EEOC,*
    458 U.S. 219 (1982).................................................................................34

*Forsyth v. City of Dallas, Tex.,*
    91 F.3d 769 (5th Cir. 1996).....................................................................46

*Franchina v. City of Providence,*
    881 F.3d 32 (1st Cir. 2018) .....................................................................20, 21

*Gallup v. Omaha Prop. & Cas. Ins. Co.,*
    282 F. App'x 317 (5th Cir. 2008) ...........................................................41

*Gideon v. Johns-Manville Sales Corp.*,
   761 F.2d 1129 (5th Cir. 1985) ..................................................................44

*Giles v. Gen. Elec. Co.*,
   245 F.3d 474 (5th Cir. 2001) ...............................................................46, 49

*Griffin v. Delchamps, Inc.*,
   No. 98-30318, 1999 WL 155682 (5th Cir. Mar. 12, 1999) ..........................55

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) ................................................................................33

*In re Hanford Nuclear Rsrv. Litig.*,
   534 F.3d 986 (9th Cir. 2008) ..............................................................39, 44

*Hansen v. Johns-Manville Prods. Corp.*,
   734 F.2d 1036 (5th Cir. 1984) ..................................................................16

*Harris v. FedEx Corp. Servs., Inc.*,
   92 F.4th 286 (5th Cir. 2024) ...............................................................*passim*

*Heaton v. The Weitz Co.*,
   534 F.3d 882 (8th Cir. 2008) ....................................................................61

*Holmes v. Reddoch*,
   117 F.4th 309 (5th Cir. 2024) ...................................................................59

*Hubbell v. FedEx SmartPost, Inc.*,
   933 F.3d 558 (6th Cir. 2019) ...............................................................58, 60

*Jimenez v. Wood Cnty.*,
   660 F.3d 841 (5th Cir. 2011) (en banc) .....................................................30

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999) ...........................................................................*passim*

*Lear Siegler Servs. v. Ensil Int'l Corp.*,
   404 F. App'x 882 (5th Cir. 2010) .........................................................21, 27

*Lockett v. EPA*,
   319 F.3d 678 (5th Cir. 2003) ....................................................................17

ix

*MacGregor v. Mallinckrodt, Inc.*,
   373 F.3d 923 (8th Cir. 2004) ..................................................................61

*Malin v. Hospira, Inc.*,
   762 F.3d 552 (7th Cir. 2014) .................................................................22

*Michaels v. Michaels*,
   767 F.2d 1185 (7th Cir. 1985) ...............................................................23

*Migis v. Pearle Vision, Inc.*,
   135 F.3d 1041 (5th Cir. 1998) .........................................................45, 46

*Miles v. S. Cent. Hum. Res. Agency, Inc.*,
   946 F.3d 883 (6th Cir. 2020) ...........................................................19, 20

*Moulton v. Alamo Ambulance Serv., Inc.*,
   414 S.W.2d 444 (Tex. 1967) ...................................................................44

*OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*,
   841 F.3d 669 (5th Cir. 2016) ..................................................................59

*Pac. Mut. Life Ins. Co. v. Haslip*,
   499 U.S. 1 (1991) ....................................................................................50

*Parker v. Gen. Extrusions, Inc.*,
   491 F.3d 596 (6th Cir. 2007) .......................................................56, 57, 61

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ..........................................................................*passim*

*Phelps Dodge Corp. v. NLRB*,
   313 U.S. 177 (1941) ................................................................................34

*Puga v. RCX Sols., Inc.*,
   922 F.3d 285 (5th Cir. 2019) ..................................................................59

*Rotkiske v. Klemm*,
   589 U.S. 8 (2019) ....................................................................................33

*Ryan v. U.S. Immigr. & Customs Enf't*,
   974 F.3d 9 (1st Cir. 2020) .......................................................................42

x

*Salinas v. O'Neill,*
　　286 F.3d 827 (5th Cir. 2002)................................................................46

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
　　538 U.S. 408 (2003)................................................................50, 58

*Summers v. Altarum Inst., Corp.,*
　　740 F.3d 325 (4th Cir. 2014)................................................................33

*Tex. Animal Health Comm'n v. Garza,*
　　27 S.W.3d 54 (Tex. App. 2000)................................................................41

*Thompson v. Quarles,*
　　297 S.W.2d 321 (Tex. Civ. App. 1956) ................................................................44

*Tompkins v. Cyr,*
　　202 F.3d 770 (5th Cir. 2000)................................................................19

*United States v. Acosta,*
　　475 F.3d 677 (5th Cir. 2007)................................................................21

*United States v. Akins,*
　　746 F.3d 590 (5th Cir. 2014)................................................................16

*United States v. Ballis,*
　　28 F.3d 1399 (5th Cir. 1994)................................................................19

*United States v. Bernes,*
　　602 F.2d 716 (5th Cir. 1979)................................................................26

*United States v. Craft,*
　　535 U.S. 274 (2002)................................................................38, 39

*United States v. Hankton,*
　　51 F.4th 578 (5th Cir. 2022)................................................................15

*United States v. Harms,*
　　442 F.3d 367 (5th Cir. 2006)................................................................29

*United States v. Jensen,*
　　41 F.3d 946 (5th Cir. 1994)................................................................16, 22

*United States v. Mateos*,
623 F.3d 1350 (11th Cir. 2010*)* ..................................................................29

*United States v. Morales*,
No. 21-50315, 2022 WL 1171064 (5th Cir. Apr. 20, 2022) ...........................29

*United States v. Parry*,
649 F.2d 292 (5th Cir. 1981) .............................................................17, 22, 28

*United States v. Polidore*,
690 F.3d 705 (5th Cir. 2012) ........................................................................23

*United States v. Richardson*,
676 F.3d 491 (5th Cir. 2012) ........................................................................35

*United States v. Robinson*,
87 F.4th 658 (5th Cir. 2023) .........................................................16, 17, 18, 22

*United States v. Smith*,
No. 21-CR-30003, 2023 WL 2456107 (S.D. Ill. Mar. 10, 2023) ....................18

*Virgin Islands Hous. Fin. Auth. v. Fed. Emergency Mgmt. Agency*,
151 F.4th 409 (D.C. Cir. 2025) ................................................................38, 39

*Wallace v. Performance Contractors, Inc.*,
57 F.4th 209 (5th Cir. 2023) .........................................................................19

*Wantou v. Wal-Mart Stores Texas, L.L.C.*,
23 F.4th 422 (5th Cir. 2022) ................................................................. *passim*

*Williams v. Trader Pub. Co.*,
218 F.3d 481 (5th Cir. 2000) ...................................................................25, 45

**Statutes**

42 U.S.C. § 1981a............................................................................... 2, 47, 48

42 U.S.C. §§ 1981a(a)(1) ...............................................................................32

42 U.S.C. § 1981a(a)(3) .................................................................................33

42 U.S.C. § 1981a(b)(1) ...................................................................52

42 U.S.C. § 1981a(b)(2) ...................................................................33

42 U.S.C. § 1981a(b)(3) ..............................................................20, 33

42 U.S.C. § 2000e-5(g)(1) ............................................................2, 32

Civil Rights Act of 1964 Title VII, 42 U.S.C. §§ 2000e *et seq.* ............1

Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 .........31

**Rules & Regulations**

Fed. R. Civ. P. 50(a) ..................................................................14, 59

Fed R. Civ. P. 50(b) .........................................................................59

Fed. R. Evid. 801(c)..........................................................................17

Fed. R. Evid. 803 ..............................................................................22

Fed. R. Evid. 803(1) ..........................................................................23

Fed. R. Evid. 803(3) ..........................................................................23

**Other Authorities**

Nita Farahany, *The Costs of Changing Our Minds*, 69 Emory L.J.
    75 (2019) .....................................................................................40

Kevin C. Klein & G. Nicole Hininger, *Mitigation of Psychological*
    *Damages: An Economic Analysis of the Avoidable Consequences*
    *Doctrine and its Applicability to Emotional Distress Injuries*, 29
    Okla. City U. L. Rev. 405 (2004) ................................................42

Eugene Kontorovich, *The Mitigation of Emotional Distress*
    *Damages*, 68 U. Chi. L. Rev. 491 (2001) ....................................41

1 McCormick On Evid. (9th ed.) (2025 update)..............................18

C. McCormick, Law of Damages (1935) ...............................34, 35, 43

Lars Noh, *Comfortably Numb: Medicalizing (and Mitigating) Pain and Suffering Damages*, 42 U. Mich. J.L. Reform 431 (2009) ........................41

Restatement (Second) of Torts ...........................................................................43

## STATEMENT OF JURISDICTION

The EEOC agrees with SkyWest's statement of jurisdiction.

## STATEMENT OF THE ISSUES

1.     Did the district court act within its discretion in admitting, with limiting instructions, text messages that were used for a nonhearsay purpose and, in any event, did not affect the outcome of the case?

2.     Did the district court act within its discretion in denying SkyWest's request for a novel failure-to-mitigate emotional distress jury instruction?

3.     Did the district court correctly determine that there was sufficient evidence to allow the jury to consider punitive damages?

## STATEMENT OF THE CASE

### A.  Course of Proceedings

The EEOC filed this enforcement action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ROA.29-36. The EEOC alleged that SkyWest employees sexually harassed Sarah Budd and that SkyWest then retaliated against her. Budd intervened, ROA.55-57, and, after discovery, the district court denied SkyWest's motion for summary judgment on the EEOC's and Budd's harassment claim, while partially granting SkyWest's motion on the retaliation claim. ROA.894-916.

The case proceeded to trial from November 12 to November 20, 2024. The jury found for the EEOC and Budd on harassment, but not retaliation. ROA.1608-11. It then awarded $170,000 in compensatory damages, which include emotional distress, and $2,000,000 in punitive damages. ROA.1615-18. The district court remitted the damages under 42 U.S.C. § 1981a to $170,000 in compensatory damages and $130,000 in punitive damages. *See* ROA.1599-1600.

SkyWest moved for a new trial and for judgment as a matter of law, ROA.2108-2138, and the district court denied it. ROA.2765-82. The EEOC sought injunctive relief under 42 U.S.C. § 2000e-5(g)(1), ROA.2350-59, and the district court granted it in part. ROA.2782-87. The district court also awarded attorney's fees to Budd as intervenor and costs to both the EEOC and Budd. ROA.2788-2818.

## B. Statement of the Facts[1]

SkyWest employees began harassing Sarah Budd as soon as she transferred to work as a parts clerk at the Dallas-Fort Worth airport in

---

[1] This section summarizes the relevant evidence adduced at trial, construed in the light most favorable to the jury's verdict.

August 2019. ROA.2876-79. On her first day, Dallin Hansen, the maintenance supervisor, asked her "if [she] liked whips and chains and leathers." ROA.2879. In front of another employee, Hansen said, "if you do[,] you'll get along just great here." *Id.* The other employee laughed. *Id.*

Hansen continued to harass her. He would often bring up whips and chains, saying, for example, "have you been misbehaving, I got to go get the whip." *Id.* He made a lot of "sexual jokes that were extremely distressing" around Budd. ROA.2880. And he "would "try to get [Budd] alone," leading other employees to "joke that, oh, Dallin likes you…better watch out." ROA.2880-01.

Hansen's harassment encouraged others to make lewd remarks to her. ROA.2881. Greg Pinchuk, the employee who first trained her, responded to someone asking about Budd by "mim[ing] a grabbing motion and [saying], oh, she's definitely a handful." ROA.2882. Meanwhile, an employee named Zach joked to Budd about a sexual position. ROA.2887. Zach also would joke about lubricant, saying it was "for your benefit" and that "If you're really pissed off grab the lube and stretch your asshole out." ROA.2888. Doug, another mechanic, would make "sexually violent" comments, saying, about his ex-wife, "If I held her hair and pulled it hard

3

enough maybe I could make her come into me and I could rape her and then she wouldn't be the bitch that she is." ROA.2888.

Shortly after Budd started, Hansen saw Pinchuk and Budd leaving for Grainger and yelled, "hey, ... why don't you take her and sell her out there and we can make some money off her." ROA.2880. Other mechanics said "yeah, she could make us lots of money there." ROA.2881. When Budd didn't understand, Pinchuk told her, "it's like a red light district, there's a lot of prostitutes out there." *Id.*

Budd immediately complained about the harassment to her husband, Michael Billotto. ROA.3305-06; ROA.3313. They would talk every day about "the ugly comments" from her coworkers. ROA.3306. They also texted, with Budd complaining, "I'm sorry baby. I can't do this" and "I'm not built for this." ROA.4246. She texted him about the harassment in "instant, realtime." ROA.2892. When Hansen told Pinchuk to sell her, she texted her husband that Pinchuk was taking her to "apparently where they're going to 'sell me' for prostitution." ROA.2896, 4246.

On September 4, Budd complained to her supervisor, Dustin Widmer. ROA.2902-03. She told him she felt "unsafe and that they were making sexual comments that were making [her] feel very uncomfortable."

4

ROA.2902, 2905, 4239. Widmer appeared "annoyed," and he told her to "just see how it goes" because "[i]f I do anything it will just put a larger target on your back." ROA.2905-06.

SkyWest had an antiharassment policy, ROA.3971-73, but Widmer did not follow it. Like all SkyWest employees, he had been trained on the policy when hired, and, like all SkyWest managers, he received another training on it when he became a manager. ROA.3154, 3248. Widmer did not ask her who was making her uncomfortable or how, take any steps to investigate her complaint, or report it to human resources. ROA.3174-75, 3190. He also did not respond when she left him a voicemail, "crying and [telling] him, 'I can't do this.'" ROA.3076.

The sexual harassment, meanwhile, "continued and escalated." ROA.2910-11. Budd's coworkers made sexual and degrading statements every day. *See, e.g.*, ROA.2911. An employee gestured "at his crotch and said 'I've got a good face cream for you.'" ROA.2972-73. Other mechanics would talk about how many women they could sleep with on road trips. ROA.2955-56.

Jim Lusk was particularly offensive. *See* ROA.2956. He asked Budd, "Are you one of those Mormons? Fucking Mormons are only good for one

thing and that's fucking." *Id.* He talked a lot about rape, saying, "people that cry rape are just stupid." *Id.* And he would say "[a] lot of things about cum and ejaculation and masturbation," including saying, "Best part of you came dripping down your mother's leg." ROA.2957.

Because of the harassment, going to work was "a piece of hell" for Budd and "a form of torture." ROA.2980. A survivor of sexual abuse, ROA.2900, Budd felt the harassment "was picking apart every piece of me." *Id.* She would vomit, get headaches, have diarrhea, and "started having nightmares." *Id.* Her husband witnessed her "[t]hrowing up a lot. Nightmares. Migraines. You name it." ROA.3308. Working at SkyWest brought back her experiences of sexual abuse. ROA.2290-91. She would cry going to work, where she "would go into the bathroom and puke." ROA.2911. One day, her coworkers were talking about "rape and why they all thought it was a man's right," Budd felt "so much pain and anger and fear inside" that she cut her arm with a box cutter. ROA.2911-12.

By October 2019, Budd was "in a dark place." ROA.2913. She couldn't stand being at her job and "couldn't see [her] way though." ROA.2914. She planned to end her life, but her husband took her to a doctor to get help. *Id.* The doctor recommended a leave of absence. *Id.*

6

Budd took medical leave from SkyWest from late October to early December 2019. ROA.3999-4001. She took medication that her doctor prescribed and saw a psychiatrist. ROA.2915-16. She hoped that Widmer "would have reached out and made some changes" while she was on leave so her coworkers "would at least treat me more respectfully." ROA.2923.

When she returned, nothing had changed. ROA.3091. "[T]he jokes, the comments, it all came right back." ROA.2957. Every time she went in the breakroom, mechanics made "humping motions, jacking off motions" and "the way they behaved, it was more than 50 percent sexual." ROA.2958. She also saw them looking at "pornographic images," talking about having sex with the women. ROA.2959.

On December 11, Budd witnessed her coworkers joke about rape because of a candy jar in the breakroom. ROA.2959-63. An employee named Carlos Avalo took the candy jar, and another described him as "humping it." ROA.3446. Although she didn't see Avalo, Budd heard her coworker "Brenda laughing hysterically and she kept saying Carlos raped it." ROA.2961. Greg then wrote "a mock letter to HR about how Carlos raped this doll." *Id.* Her coworkers kept joking and putting up notes. *See* ROA.2961-62, 4222-24. One note said, "Carlos raped me this morning in

7

front of three people." ROA.2962-63, 3995. Budd estimated she heard her coworkers say "rape" at least forty times that day. ROA.2963.

That same day, feeling "extremely desperate," Budd wrote a letter to management asking to work part-time. ROA 2964-65. She said she wanted "to work full time again down the road," but needed to make a change, she explained, "due to the salacious environment (which has already been expressed), family needs and [her] own health." ROA.4237.

Three days later, no one at SkyWest had responded. ROA.2969-70. Budd then formally complained about the harassment. ROA.2966-69. She emailed Widmer, referring to her September 4th complaint and telling him "the environment only continues." ROA.4238. She explained that the harassment caused "a complete deterioration of my mental, emotional, and even physical health." *Id.* She invoked SkyWest's anti-harassment policy and described examples of the rape comments surrounding the candy jar incident and other harassment. *Id.*

Widmer wrote back, telling Budd he "had no idea this was still an issue." ROA.4218. He asked to bring Hansen into it, *id.,* but Budd told him Hanson was part of the harassment. ROA.2975, 4218. Budd did not go to

8

work the next day, and Widmer told her to "[c]ome in or lose your job." ROA.2975.

Two days later, Budd submitted a complaint to human resources. ROA.2359, 3979-81. She again described the harassment and its effect on her. ROA.3979-81. She informed human resources that Widmer had ignored her complaint and that Hansen "contributes [to] and ignores" the harassment. ROA.3980.

After that complaint, Kellie Dehais from Employee Relations contacted her. ROA.2983, 3242. Dehais asked Budd to identify the employees involved, and Budd told her "most of the maintenance department contributes to it." ROA.2983. Dehais offered to read Budd a list of names, and, when she did, Budd identified harassers and witnesses. ROA.2984. Dehais did not go over the comments with her, ROA.3115-16, or ask "who said what or quotes." ROA.2984. She put Budd on paid administrative leave and promised to investigate. ROA.2984, 4732.

That investigation was flawed. Dehais's normal practice was to "interview every person that I can that has been named as a witness." ROA.3257. This time, Dehais "randomly selected" who to interview.

9

ROA.3267. She interviewed half of the people Budd had identified. *See* ROA.3263-65, 3985-90.

In those interviews, witnesses corroborated that there was sexualized and vulgar behavior. Ginny Long confirmed the candy jar incident. ROA.3988. She also said that there was "sex talk in general," *id.*, but Dehais did not remember asking what she meant. ROA.3268. Jamie Pena confirmed hearing the "types of conversations" Budd described. ROA.3269, 3987-88. Greg Pinchuk and Brenda Kelly admitted to participating in the candy jar incident and Brenda said they took pictures of it, ROA.3273, 3986-87, but Dehais never asked for those pictures. ROA.3273, 3986-87. Meanwhile, Avalo told her there were "[p]ictures of women" in the workplace and described the candy jar incident. ROA.3986. He suggested training on SkyWest's antiharassment policy, "especially for" Hansen. ROA.3985. And, while Avalo later testified that an employee named Zach said that "I would love to fuck" Budd, that he heard employees making jokes about lube, and that he had seen someone looking at a picture of a naked woman at work, Avalo said he did not remember Dehais asking about anything except the candy jar incident. *See* ROA.3205-06, 3214-15.

10

Dehais also chose not to interview at least one harasser. Budd and two witnesses told Dehais that Lusk used "sexual language" in the workplace. ROA.3271. But Dehais never investigated Lusk or disciplined him. *Id.*

Dehais finished her investigation in February 2020. ROA.3276. While she noted discipline for several employees involved in the candy jar incident, including Carlos Avalo, Avalo testified he was never disciplined. ROA.3218, 3276; *see also* ROA.3983 (listing discipline documents without one for Avalo). The discipline itself was minimal—only one counseling statement for untruthfulness, and the others received the type of letter that managers could issue for "tardies or no show, something simple like that." ROA.3159, 3280.

Dehais did not discipline Hansen, Widmer, or anyone who was not involved in the candy jar incident. *See* ROA.3982-83. Based on her interviews, she decided she "could not find any specific individuals who were making the comments," so "instead of blatantly terminating the entire department, [her] recommendation was to provide the training and expectations moving forward." ROA.3278. She did not contact Budd at the end of the investigation to tell her the results. ROA.3281.

11

In May 2020, Budd emailed Dehais to ask why she had not heard anything about the investigation. ROA.2997, 3985. Dehais told her that she would tell her when she could return to work. ROA.3985. In the meantime, due to the COVID pandemic, SkyWest had offered early retirement to all of its employees in April with a deadline in May 2020. ROA.4007. Budd knew no one had been fired and she did not believe SkyWest would do the training or that Dehais would contact her. ROA.2998. After waiting until the last day of the early retirement offer to see if Dehais would contact her, Budd took the early retirement offer on May 31, 2020. ROA.3000-01.

SkyWest did not implement the training for three more years, until after this lawsuit was filed. ROA.29-35, 3277.

### C. District Court's Decision

After trial, SkyWest moved for judgment as a matter of law on punitive damages and for a new trial based on the admission of several text message exhibits and the district court's denial of a jury instruction. ROA.2108-2137. The district court denied the motion. The court held that there was sufficient evidence supporting punitive damages, with evidence allowing the jury to find at least one SkyWest manager acted with malice or reckless indifference to Budd's federally protected rights and allowing

12

the jury to find SkyWest did not establish a good faith defense. ROA.2774-2777. It then held that admitting the text message exhibits "was not prejudicial error warranting a new trial" and that SkyWest's proposed jury instruction on mitigating emotional distress "was not correct as a matter of law." ROA.2779, 2782. This appeal followed.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for a new trial based on evidentiary objections for an abuse of discretion, and the moving party must show their substantial rights are affected. *Wantou v. Wal-Mart Stores Texas, L.L.C.*, 23 F.4th 422, 431-32 (5th Cir. 2022). This Court similarly reviews a motion for a new trial based on jury instructions for abuse of discretion and then for whether any error was harmless. *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 378 (5th Cir. 2017); *Adams v. Mem'l Hermann*, 973 F.3d 343, 352 (5th Cir. 2020).

Motions for judgment as a matter of law are reviewed de novo, with deference to the jury's verdict. *Wantou*, 23 F.4th at 431.

## SUMMARY OF ARGUMENT

SkyWest did not show a new trial was warranted based on the admission of text message exhibits or the district court's rejection of

13

SkyWest's failure-to-mitigate emotional distress jury instruction. The district court did not abuse its discretion in admitting the exhibits, with limiting instructions, to show the harassment's effect on Budd. And SkyWest did not demonstrate its substantial rights were affected, as the texts were also admissible on other grounds and were cumulative of other evidence. SkyWest's jury instruction that would require mitigation of emotional distress, meanwhile, had no basis in the text of Title VII. SkyWest asks this Court to infer Congress implicitly imposed that additional duty to mitigate, but SkyWest did not show it was a common law rule so well established when Congress provided emotional distress damages for Title VII plaintiffs that it justifies inferring an additional defense.

SkyWest also challenges the sufficiency of the evidence supporting punitive damages, but the jury could find that any of three managers acted with malice or reckless indifference to Budd's rights. SkyWest forfeited its good faith defense below by failing to raise it in a Rule 50(a) motion, and, even if it did not, the jury heard testimony and saw evidence from which it could find SkyWest did not make a good faith effort to comply with Title VII.

## ARGUMENT

**I.   SkyWest did not make the difficult showing necessary for a new trial based on evidentiary objections.**

SkyWest does not challenge the sufficiency of the evidence supporting the jury's verdict finding SkyWest subjected Budd to a hostile work environment. Instead, it argues only that the admission of text message exhibits, which were not used for their truth and were cumulative of other record evidence, justifies overturning the jury's verdict. But SkyWest has not shown that the district court abused its discretion or that any purported error affected SkyWest's substantial rights.

### A.   Standard of Review

To obtain a new trial based on evidentiary rulings, SkyWest must show the district court abused its discretion.[2] It must also show "that the substantial rights of the parties were affected." *Wantou*, 23 F.4th at 432; *Adams*, 973 F.3d at 349. "When a party fails to show that excluding the

---

[2] This Court has sometimes suggested that it reviews hearsay rulings de novo. *See, e.g.*, *United States v. Hankton*, 51 F.4th 578, 600 (5th Cir. 2022). Those decisions also acknowledge that evidentiary rulings are reviewed for abuse of discretion, *id.* at 601, reflecting that a district court abuses its discretion when it applies an incorrect legal rule, *Wantou*, 23 F.4th at 432, not that hearsay rulings are subject to a different standard than other evidence.

evidence would have altered the outcome of the case, the party has not met its burden for a new trial." *Echeverry v. Jazz Casino Co.*, 988 F.3d 221, 235 (5th Cir. 2021).

The moving party cannot make this showing if the challenged evidence was admissible on any other basis. *United States v. Jensen*, 41 F.3d 946, 958 (5th Cir. 1994). Similarly, "the improper admission of evidence that is merely cumulative on matters shown by other admissible evidence is harmless error." *Hansen v. Johns-Manville Prods. Corp.*, 734 F.2d 1036, 1040 (5th Cir. 1984). Thus, admitting testimony is harmless where "it [is] cumulative of other testimony." *United States v. Akins*, 746 F.3d 590, 600 (5th Cir. 2014); *see also United States v. Robinson*, 87 F.4th 658, 673 (5th Cir. 2023) (any error was harmless because statement "was cumulative" of admitted text message).

### B. The district court did not abuse its discretion in admitting the challenged exhibits.

SkyWest argues that four text message exhibits admitted at trial were entirely hearsay,[3] but it addresses only one text in its opening brief. As the

---

[3] SkyWest did not object to Exhibits 20 and 22 below, and it does not reference them on appeal. It cannot raise any issue with them in reply. *Lockett v. EPA*, 319 F.3d 678, 684 n.16 (5th Cir. 2003).

district court ruled, that text, and others in these exhibits, were not admitted for their truth. Instead, they served a nonhearsay purpose relevant to the harassment claim and damages.

Hearsay is "a statement that ... a party offers in evidence to prove the truth of the matter asserted *in the statement.*" Fed. R. Evid. 801(c) (emphasis added). "[W]henever an out-of-court statement is offered for some purpose other than to prove the truth of the matter asserted, ... [the statement] is not subject to attack as hearsay." *United States v. Parry*, 649 F.2d 292, 295 (5th Cir. 1981).

Thus, the court must assess each statement in turn to determine whether it is being used for its truth. *Robinson*, 87 F.4th at 671-72 ("The hearsay character of a statement ... is necessarily tethered to individual statements or categories of statements."). As "not all discussions or conversations within a recording or document are 'statements' ... object[ing] to the entire recording or document as being 'hearsay,' without specifically identifying the 'statement,' ... is problematic." *United States v. Smith*, No. 21-CR-30003, 2023 WL 2456107, at *3 n.1 (S.D. Ill. Mar. 10, 2023).

17

Here, SkyWest almost completely fails to identify which statements it believes were used for their truth.[4] It discusses only one text, in which Budd tells her husband "It's out near Dallas. [A]pparently where they're going to 'sell me' for prostitution." ROA.4247. SkyWest asserts that this "prostitution" text "was offered to support her claim that Dallin Hansen once recommended to other employees that they prostitute her on their next work trip." Op. Br. at 11. But the text does not say that. And SkyWest concedes that "[o]bviously, EEOC did not offer the texts for their *literal* truth." *Id.* at 15.

Indeed, Plaintiffs did not use the "prostitution" text for its truth at all. The EEOC and Budd used it, as the district court explained, to show that she made the statements. *See United States v. Ballis*, 28 F.3d 1399, 1405 (5th Cir. 1994) (statements not hearsay because they "were offered simply to prove that they were made"); *Tompkins v. Cyr*, 202 F.3d 770, 779-80 & n.3

---

[4] SkyWest briefly argues that "[t]here was no effort to evaluate each text separately," Op. Br. at 14, but it did not raise that concern until after the close of evidence. *See* ROA.3636-37. And SkyWest had to identify which texts it believed the district court erred in admitting. *See Robinson*, 87 F.4th at 671-72; *see also* 1 McCormick On Evid. § 52 (9th ed.) (2025 update). SkyWest did not object to specific texts below, nor does it address any other statement in the exhibits.

18

(5th Cir. 2000) (threats were not hearsay because they were not factual statements, but verbal acts relevant for fact they were received); *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 889 (6th Cir. 2020) (statement not hearsay when used to show witness received complaints).

That was necessary because, to prevail, the EEOC and Budd had to prove more than that SkyWest employees harassed her. The jury had to find that Budd "suffered unwelcome harassment" that was "objectively and subjectively offensive, ... that a reasonable person would find hostile or abusive, and ... that the victim did in fact did perceive to be so." *Wantou*, 23 F.4th at 433 (citation modified); ROA.1585 (jury instructions stating that "Budd must actually find the conduct offensive"). Evidence that an individual complained about the harassment is relevant to whether she subjectively viewed the environment as hostile. *Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 223 (5th Cir. 2023). And the EEOC and Budd also sought to prove that the harassment caused emotional distress. *See* 42 U.S.C. § 1981a(b)(3).

The "prostitution" text is part of a series that Budd sent her husband between 10:47 a.m. and 11:08 a.m. on August 30, 2019, in which she wrote, "I can't do this. I'm trying to not complain," "I'm so sorry I'm not built for

19

this," and "I hate them." ROA.4246-47. These texts, including the prostitution text, thus show Budd complaining to her husband shortly after she started working at the Dallas-Fort Worth airport. The fact of the complaints—irrespective of their contents' truth—showed that she perceived the work environment as offensive, the harassment was unwelcome, and it caused her emotional distress. *See Miles*, 946 F.3d at 889 (complaints not hearsay when admitted to show declarant complained); *see also Franchina v. City of Providence*, 881 F.3d 32, 50 (1st Cir. 2018) (out-of-court statements describing harassing incidents not hearsay when used to show notice).

The district court admitted the exhibit containing the "prostitution" text, for that nonhearsay purpose. It noted that the EEOC and Budd "have to prove the subjective component" and that the text messages reflected that Budd was complaining. ROA.2893. It then instructed the jury that the exhibit "is not being admitted for the truth of what is stated in the text messages *but the making of them*." ROA.2894 (emphasis added). It continued, "it doesn't matter ... whether what is being said is true but instead what the witness is complaining about to her husband." *Id.* The district court then reminded the jury in its final instructions that

20

"[e]vidence admitted before you for a limited purpose may not be considered for any purpose other than the limited purpose for which it was admitted." ROA.3778.

This Court typically "assume[s] that the jury followed the court's limiting instructions, which directed their attention to the non-hearsay matter." *Lear Siegler Servs. v. Ensil Int'l Corp.*, 404 F. App'x 882, 884 (5th Cir. 2010); *see also United States v. Acosta*, 475 F.3d 677, 683 (5th Cir. 2007). SkyWest has not shown why the jury would not have followed those limiting instructions here.

## C. Any error in admitting the text message exhibits did not affect SkyWest's substantial rights.

Even if the district court abused its discretion in admitting the text message exhibits, SkyWest has not addressed the second, necessary step for obtaining a new trial: showing the error affected its substantial rights. SkyWest cannot do so for two independent reasons. First, the district court could have admitted text messages for other permissible purposes, so "the district court's reliance on other grounds does not affect the defendant's

21

substantial rights."[5] *Jensen*, 41 F.3d at 958. Second, the texts were cumulative, so any error in their admission was harmless. *Robinson*, 87 F.4th at 672.

### 1. The texts were admissible on other grounds.

If, as SkyWest seems to argue, the "prostitution" text was admitted for the truth of an implied statement about the harassment Budd endured, it and similar texts could have been admitted under exceptions to the hearsay rule set out in Fed. R. Evid. 803.

First, the district court could have admitted the "prostitution" text message and other messages as present sense impressions. *See, e.g.*, *Malin v. Hospira, Inc.*, 762 F.3d 552, 555 (7th Cir. 2014) (out-of-court statement describing harassment admissible as a present sense impression). A present sense impression is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."

---

[5] The same argument applies with equal force to the district court's order denying SkyWest's motion for a new trial, which confirms that the court "properly overruled SkyWest's hearsay objection" during trial because the exhibits were not offered for the truth of the matter asserted. ROA.2779. While the court suggested other purposes for which the evidence could have been admitted, it appropriately cited *Parry*, 649 F.2d at 295, and did not distance itself from its original rulings on the text messages' admissibility.

Fed. R. Evid. 803(1). A statement may reflect a present sense impression if made shortly after the event described. *United States v. Polidore*, 690 F.3d 705, 720-21 (5th Cir. 2012). Under SkyWest's theory, the "prostitution" text describes harassment that Budd endured, and Budd sent it in "instant, realtime." ROA.2892; *see also Michaels v. Michaels*, 767 F.2d 1185, 1193-94, 1201 (7th Cir. 1985) (statement in telex message was present sense impression when sent immediately after the described conversation).

Second, the district court could have admitted the text messages because they described Budd's mental and physical state. Fed. R. Evid. 803(3). Budd's messages included descriptions of her physical state, saying, "I[']m going to puke" and "my head hurts." ROA.4259-60. She also texted about her emotional state and state of mind, saying, "I can't do this," ROA.4246, "I hate them," *id.*, and that she wanted to see a doctor for "depression," ROA.4262.

### 2. The texts were cumulative of other evidence.

SkyWest also cannot show any error in the admission of the text messages "affect[ed] the outcome of the proceeding." *Harris*, 92 F.4th at 303. Testimony is not outcome-determinative when it is "cumulative of

23

other evidence supporting the same conclusion." *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1052 (5th Cir. 1996).

Even if the texts had been used to show the harassment occurred, SkyWest apparently concedes that they were cumulative of other testimony. It argues that the text messages exhibits "substantiate[d]" Budd's testimony "of events that no other witness corroborated." Op. Br. at 10. In doing so, it acknowledges that Budd testified about all the harassment she endured. As they were thus cumulative under SkyWest's argument, the texts could not affect the trial's outcome.

Moreover, SkyWest significantly overstates the significance of the "prostitution" text. Should this Court find that text somehow inadmissible, SkyWest can only argue, at best, that it corroborated Budd's testimony about one of Hansen's comments. But a hostile work environment can include many acts, *Wantou*, 23 F.4th at 433, and Budd testified to far more harassment than just Hansen's statement about prostitution—much of it egregious. *See, e.g.*, ROA.2879 (describing Hansen asking her if she "liked whips and chains and leathers"); ROA.2956-57 (testifying that a coworker said "a lot of things about cum and ejaculation and masturbation").

24

SkyWest has not suggested, much less shown, how corroborating just one of a long series of harassing acts affected the outcome.[6]

SkyWest also minimizes the evidence corroborating Budd's testimony. The jury heard evidence corroborating that Budd subjectively perceived the harassment as offensive and unwelcome, including testimony from her husband, *see, e.g.*, ROA.3305-08, and from Dehais, ROA.3262-63 (observing that Budd was "[f]rustrated" and "upset"). And, to the extent that SkyWest argues the texts were used to prove the harassing acts occurred, the jury heard and saw evidence, including photographs, corroborating the repeated comments about rape during the candy jar incident. ROA.3210-12, 3268-77, 3979-97. The jury could also have reasonably noted similarities between Budd's description of the work environment and her coworkers' observations about that environment. *Compare, e.g.*, ROA.2887 (Budd testifying her coworker joked about a sexual position she might like) *with* ROA.3205 (Avalo testifying he heard a coworker say that he "would love to fuck" Budd); ROA.2959 (Budd

---

[6] Nor has it shown why Budd's testimony alone would be insufficient to support liability. *Cf. Williams v. Trader Pub. Co.*, 218 F.3d 481, 486 (5th Cir. 2000) (plaintiff's testimony enough to support compensatory damages award).

testifying she saw coworkers look at "pornographic" pictures of women) *and* ROA.3206 (Avalo testifying he saw a coworker look at a picture of a naked woman); *see also* ROA.3268-69. The jury could also have considered that Budd's testimony was consistent with her written complaints to SkyWest, ROA.3979-81, 4010-11, which were admitted without objection. Meanwhile, SkyWest's cross-examination of Budd lessens any potential prejudice. *United States v. Bernes*, 602 F.2d 716, 721 (5th Cir. 1979) ("[A]ny prejudicial effect of the testimony is lessened by the availability of those very persons whose implied statements are the source of appellant's objections").

SkyWest also asserts, without evidence or authority, that the admission of the texts affected the size of the punitive damages award. The Title VII punitive damages standard "focus[es] on . . . the employer's state of mind." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). The texts revealed Budd's state of mind—not SkyWest's. The district court instructed the jury on the punitive damage standard and gave the jury limiting instructions on the text message exhibits. SkyWest has offered no evidence that the jury ignored those instructions in awarding punitive damages. *See Lear Siegler Servs.*, 404 F. App'x at 884.

**D. Brief comments in the closing arguments do not show an error that affected SkyWest's substantial rights.**

SkyWest emphasizes parts of closing arguments that it believes show the text messages were used for their truth, but those comments reflect the nonhearsay use of the texts. Even if they did not, SkyWest did not make a timely objection and has not shown plain error.

SkyWest's attack on two sentences from intervenor counsel's closing, in which counsel urged the jury to review the text messages in detail, Op. Br. at 12 (quoting ROA 3706), is without merit. Immediately beforehand, intervenor counsel said, "As you think about the toxic work environment *and the effect it had on Sarah Budd*, I ask you to review some of the text messages that Ms. Budd sent …." ROA.3706 (emphasis added). This is consistent with the nonhearsay purpose for which the district court admitted the text messages: showing that the harassment was unwelcome and that Budd perceived it as offensive.

The comments SkyWest highlights from the EEOC's closing similarly reflect a nonhearsay purpose. SkyWest argues that the EEOC used the text messages for their truth because counsel for the EEOC said, "This wasn't a lie." Op. Br. at 12. That small part of the closing, however, was a response

27

to SkyWest's trial theme that Budd had made up the harassment to get out of working Christmas and an imminent change to night shift. *See* ROA.3017-19 (discussing bid schedules and whether she was scheduled to work Christmas 2019); ROA.3349 (eliciting testimony about working Christmas); ROA.3458 (eliciting testimony that Budd "wanted day shift"); ROA.3592-93 (eliciting testimony that Budd would have been moved to a night shift in January). That argument culminated in SkyWest's final cross-examination of Budd the day before closing arguments.[7] ROA.3629 ("The truth is you knew the second shift was coming and that's the timing of you doing this on December 14th, isn't it?").

The EEOC thus referred to the timing of Budd's texts, not for the truth of the matter asserted in them, but as circumstantial evidence about the timing of Budd's complaints. *See Parry*, 649 F.2d at 295 (statement not hearsay when "offered ... as the basis for a circumstantial inference by the jury" that does not depend on the truth of the matter asserted); *see also*

---

[7] SkyWest reasserted this argument during closing, stating that "we can't deny the significance of why all of these things are being reported on December 14th and the inconsistency with all the things I've already mentioned, but she knew that starting in January they were going to do a second shift and she was going to be one of two parts clerks that worked the second shift." ROA.3748.

*United States v. Mateos*, 623 F.3d 1350, 1355 (11th Cir. 2010*) (statement not hearsay because not used for its truth but to show behavior that "was inconsistent with the [opposing party]'s theory"). Consistent with that purpose, the EEOC emphasized that Budd sent the texts "in realtime" and said the jury would "see the time stamps on those texts." ROA.3712. The plaintiffs' response to SkyWest's motion for a new trial confirmed that use, arguing that Budd's complaints were "significant to show she was offended by her work environment *from the beginning*, and counter Defendant's argument that the harassment did not occur and that *Budd fabricated a complaint in December 2019* so she could have the holidays off or avoid working the second shift." ROA.2566 (emphases added).

Even if the passages cited in the closing could be read to suggest an inadmissible use for the text messages, SkyWest's objection after closing was untimely. ROA.3776; *see United States v. Harms*, 442 F.3d 367, 378 (5th Cir. 2006). This Court thus reviews only for plain error. *Id.*; *United States v. Morales*, No. 21-50315, 2022 WL 1171064, at *2 (5th Cir. Apr. 20, 2022) (reviewing "Government's reference to the alleged hearsay in its closing argument" for plain error).

29

SkyWest has not articulated any plain error here, nor could it. Plain error requires "a clear or obvious error that affected [its] substantial rights," which also "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Fullwood*, 342 F.3d at 413 (citation modified). Here, no error affected SkyWest's substantial rights, *see supra* Section I.C, let alone such an error that it affected the proceeding's fairness and integrity.

## II.   The district court appropriately rejected SkyWest's novel failure-to-mitigate emotional distress instruction.

SkyWest seeks a new trial because the district court declined to adopt its proposed mitigation instruction to limit emotional distress damages. But this Court reviews jury instructions "under an abuse of discretion standard, affording the trial court substantial latitude in describing the law to the jurors." *Jimenez v. Wood Cnty.*, 660 F.3d 841, 845 (5th Cir. 2011) (en banc) (citation modified). "[T]he legal accuracy of an instruction" is reviewed de novo, but to warrant reversal, a denied instruction must be, among other things, "a substantially correct statement of law." *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 378 (5th Cir. 2017). This

Court "will not reverse unless the erroneous instructions affected the outcome of the case." *Adams*, 973 F.3d at 352 (citation modified).

As the district court held, SkyWest's proposed instruction "was not correct as a matter of law." ROA.2782. SkyWest's proposed instruction would impose a novel mitigation defense that could penalize an individual for choosing not to take psychotropic drugs, for example, if they suffer emotional distress. *See* Op. Br. at 20-21, 38. But Congress did not include that defense when it authorized compensatory damages in the 1991 amendments to Title VII. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 ("the 1991 Amendments"). SkyWest also has not shown that Congress silently incorporated a common law failure-to-mitigate emotional distress defense. Thus, the district court did not abuse its discretion in declining SkyWest's proposed instruction.

## A. The instruction SkyWest sought was inconsistent with the statutes and the pattern instructions.

By statute, defendants in Title VII cases may assert a mitigation defense to backpay, but the statute does not provide the same defense for emotional distress damages. This Court's Title VII pattern instructions

similarly provide a mitigation defense for backpay, but not emotional distress damages.

### 1. Title VII provides a failure-to-mitigate defense for backpay but not for emotional distress damages.

Congress chose when to provide a failure-to-mitigate defense for Title VII claims, and the district court appropriately declined to write one in elsewhere. SkyWest has not shown that was error.

Title VII provides that, if a plaintiff receives backpay, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). Congress did not include similar "operate to reduce" language when it authorized compensatory damages—including emotional distress damages—in the 1991 Amendments. *See* 42 U.S.C. §§ 1981a(a)(1); 1981a(b)(3). Congress's silence is telling because it *did* impose limits on Title VII compensatory damages in other respects. First, it barred compensatory damages for disparate impact claims. 42 U.S.C. § 1981a(a)(1). Second, it circumscribed the amount of compensatory damages available, capping the combination of compensatory and punitive damages to a maximum of $300,000 for claims

32

against the largest employers. 42 U.S.C. § 1981a(b)(3). And it precluded compensatory damages altogether in certain cases arising under another statute. 42 U.S.C. § 1981a(a)(3) (discussing the Americans with Disabilities Act).

This Court may draw a negative inference from the presence of a failure-to-mitigate defense for backpay but not for emotional distress damages. *See, e.g.*, *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 332 (4th Cir. 2014); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (declining to read motivating factor standard into ADEA when the 1991 Amendments codified the standard for Title VII, but not the ADEA). "Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019). While Congress enacted the 1991 Amendments at a different time than Title VII's failure-to-mitigate backpay defense, Congress referenced Title VII's backpay provisions in the 1991 Amendments. *See* 42 U.S.C. § 1981a(b)(2) (defining compensatory damages for Title VII claims to exclude "backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964").

33

SkyWest relies extensively on the only district court decision to adopt its proposed instruction in a Title VII case, *EEOC v. SDI of Mineola, Tex., LLC*, 631 F. Supp. 3d 418 (E.D. Tex. 2022), but SkyWest's reliance on *SDI* to explain away the statutory language is misplaced. The *SDI* court hypothesized that Title VII "may well have needed to mention the mitigation defense" because it encompassed more than common law mitigation by including both "what a person could have earned in the interim period" and "what a person did in fact earn." *Id.* at 421. But neither Title VII's history nor the common law mitigation defense support that speculation.

Title VII's "backpay provision was expressly modeled on the backpay provision of the National Labor Relations Act," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975), which has long included both the plaintiff's actual earnings and what the plaintiff could have earned with reasonable diligence during the mitigation period. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197-98 (1941). Meanwhile, Title VII's backpay mitigation provision is "rooted in an ancient principle of law." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 & n.15 (1982) (citing C. McCormick, Law of Damages 127-158 (1935)); *see also* 5 Larson on Employment Discrimination

34

§ 92.08 (stating that the Title VII backpay mitigation "formula has its roots in the common law of damages computation"). And mitigation at common law included both "what the plaintiff did earn" and what the plaintiff "could by reasonable diligence have earned." McCormick, Law of Damages 627.

Congress's choice to include the mitigation defense for backpay thus cannot be explained away as requiring more than the common law. That choice instead highlights Congress's omission of a mitigation defense for emotional distress damages in the 1991 Amendments.

> **2. This Court's pattern instructions provide a failure-to-mitigate defense for Title VII backpay, but not for Title VII emotional distress damages.**

"[I]t is well-settled ... that a district court does not err by giving a charge that tracks this Circuit's pattern jury instructions and that is a correct statement of the law." *United States v. Richardson*, 676 F.3d 491, 507 (5th Cir. 2012) (citation modified). SkyWest insists the district court erred in refusing its proposed instruction, but the district court used instructions that track the pattern instructions and mirror the text of Title VII and the 1991 Amendments.

35

The pattern instructions provide general instructions for damages in chapter 15 and instructions for employment claims, including Title VII claims, in chapter 11. 5th Cir. Pattern Civ. Jury Instr. (2020). Chapter 15's Overview notes that its instructions "are very general in nature" and that "[s]ome federal claims have specific rules governing damages." *Id.* at 339. It then identifies a "claim[] under Title VII" as that kind of claim, pointing to "Instruction No. 11.14 ... for the rules governing damages" for Title VII. *Id.*

SkyWest argues that the district court should have nonetheless used an instruction based on pattern instruction 15.5, which addresses mitigation of damages in general, but that instruction does not apply to Title VII claims. Not only does the Chapter 15 Overview identify instruction 11.14 for Title VII damages, but instruction 15.5, which SkyWest relies upon, expressly instructs practitioners that, "[f]or [a] claim[] under Title VII ... , please refer to the mitigation instruction contained in Instruction No. 11.14." *Id.* at 345 n.1.

The Title VII-specific instruction itself also undercuts SkyWest's argument. It has separate sections for backpay and compensatory and punitive damages. *Id.* at 220-33. The backpay section instructs the jury on the failure-to-mitigate backpay defense. *Id.* at 225-27. The compensatory

and damages section, meanwhile, instructs the jury on the *Kolstad* affirmative defense to punitive damages but does not instruct on a failure-to-mitigate emotional distress defense—nor do the corresponding Committee Notes. *See id.* at 220-23, 227-29.

## B. SkyWest misapplies an interpretative canon to urge a new defense for Title VII emotional distress damages.

Lacking a statutory source for its mitigation instruction, SkyWest argues that Congress tacitly incorporated a common-law mitigation obligation. The district court correctly rejected that argument, holding that Title VII "does not impose a duty to mitigate emotional harm" because any "supposed common-law duty to mitigate emotional harms plainly is not" well established. ROA.2781-82.

### 1. The interpretative canon permitting courts to infer that Congress implicitly incorporated a well-established common law principle in a federal statute is narrow.

SkyWest bases its argument on a canon of construction set out in *Astoria Federal Savings & Loan Association v. Solimino*, 501 U.S. 104 (1991). In that case, the Court noted that "Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria*, 501 U.S. at 108. As a result, "where a common-law principle is well established ...

37

the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Id.* (citation modified). This canon, however, applies more narrowly than SkyWest acknowledges.

The canon requires the common law rule to be established by the time the statute was enacted. *See, e.g., Pasquantino v. United States*, 544 U.S. 349, 360 (2005) (looking to "the state of the common law as of 1952, the year Congress enacted the wire fraud statute" at issue). This temporal limit is essential because the canon turns on whether the Court "must assume that Congress considered the impact of its enactment on the question now before us." *United States v. Craft*, 535 U.S. 274, 288 (2002).

The common law rule must also apply to the specific subject. In *Pasquantino*, the Supreme Court required evidence that the purported common law rule "barred the United States from prosecuting a fraudulent scheme to evade foreign taxes." *Pasquantino*, 544 U.S. at 360. Similarly, in *Craft*, the Supreme Court, in assessing a federal tax lien, looked for a common law rule that applied specifically to federal tax liens. 535 U.S. at 288. To invoke the canon, a party must thus show the common rule "clearly applied to the subject matter at hand." *Virgin Islands Hous. Fin.*

38

*Auth. v. Fed. Emergency Mgmt. Agency*, 151 F.4th 409, 416 (D.C. Cir. 2025) (citation modified).

The canon also requires the common law rule to be "well established." *Astoria*, 501 U.S. at 108. It does not apply when where "[t]here was not much of a common-law background" on the issue. *Craft*, 535 U.S. at 288. Because the canon requires "clear judicial recognition" of the common law rule, it is also insufficient if earlier cases only "arguably planted the seeds" for the rule. *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1000-01 (9th Cir. 2008). In making that determination, courts often look to pre-enactment appellate decisions and scholarship summarizing the common law, without focusing on the law of any given state.[8] *See Pasquantino*, 544 U.S. at 360-61; *Virgin Islands Hous. Fin. Auth.*, 151 F.4th at 416-17.

---

[8] As the Supreme Court has cautioned, in another context, "our interpretation of Title VII is informed by the general common law of agency, rather than the law of any particular State." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 542 (1999) (citation modified).

## 2. SkyWest does not identify a common law rule that fits within the interpretative canon.

SkyWest does not engage in any depth with the *Astoria* line of cases. Instead, it relies extensively on the *SDI* district court decision and a series of scattered cases that do not identify a well-established common law rule requiring mitigation of emotional distress damages when Congress enacted the 1991 Amendments to Title VII.[9]

Indeed, SkyWest cites law review articles stating there is *not* a well-established rule requiring plaintiffs to mitigate their emotional distress. In its opening brief, SkyWest notes that these authors "*urged* courts to apply the doctrine of avoidable consequences to noneconomic loss," Op. Br. at 37 (emphasis added), acknowledging the articles advocate for a rule that was not already well established. The articles then make that clear. Nearly thirty years after the 1991 Amendments, one article states that "history still leaves unresolved whether a plaintiff's recovery for emotional distress injuries should be limited by the doctrine of avoidable consequences." Nita

---

[9] While the canon has two prongs, looking first to whether there is a well-established common law rule that Congress would have expected to apply and then to whether there is a contrary statutory purpose, *Pasquantino*, 544 U.S. at 359, this Court need only address the first step because SkyWest does not identify a well-established common law rule.

Farahany, *The Costs of Changing Our Minds*, 69 Emory L.J. 75, 86 (2019).

Another observes that "courts have shown some hesitancy in applying a

duty to mitigate pain and suffering" and describes the issue as "rarely

litigated." Lars Noh, *Comfortably Numb: Medicalizing (and Mitigating) Pain

and Suffering Damages*, 42 U. Mich. J.L. Reform 431, 450 (2009). And, as the

district court noted below, the third article said that "[d]espite the

ubiquitous use of mitigation in determining damages, courts have

neglected to apply the rule to emotional distress." ROA.2782 (quoting

Eugene Kontorovich, *The Mitigation of Emotional Distress Damages*,

68 U. Chi. L. Rev. 491, 500 (2001)); *see also* Kontorovich, 68 U. Chi. L. Rev.

at 492 ("[C]ourts have failed to apply mitigation to emotional distress.").

SkyWest also fails to apply the canon by its terms. For the canon to

apply, the relevant common law rule must predate the statute. *Pasquantino*,

544 U.S. at 360. SkyWest, however, relies almost exclusively on decisions

that post-date the 1991 Amendments.[10] *See* Op. Br. at 23-38.

---

[10] While the post-enactment cases SkyWest cites are not relevant to the
canon because they do not speak to the law at the time of the 1991
Amendments, we note that many also do not address the mitigation of
emotional distress. *See, e.g.*, *Gallup v. Omaha Prop. & Cas. Ins. Co.*,
282 F. App'x 317, 321 (5th Cir. 2008) (an insurance dispute involving
mitigation of property damage from a flood); *Tex. Animal Health Comm'n v.*

41

The canon also requires that the asserted common law rule apply to the issue in a given case. *See, e.g.*, *Pasquantino*, 544 U.S. at 362. Thus, "the party seeking to read a common law rule into the statute can only do so if the factual circumstances are closely analogous to a case of which Congress would have been aware." *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 24 (1st Cir. 2020). And, even then, it applies "only if that rule was 'long-established and familiar' at the time of the statute's enactment." *Id.* at 20 (quoting *Pasquantino*, 544 U.S. at 359-60).

That specificity is particularly important here because the mitigation SkyWest demands would implicate interests that a more general rule would not. *See Dohmann v. Richard*, 282 So.2d 789, 793-94 (La. Ct. App. 1973) (declining to apply a physical injury mitigation rule to require shock therapy "designed to work a change in his personality"); Kevin C. Klein & G. Nicole Hininger, *Mitigation of Psychological Damages: An Economic Analysis of the Avoidable Consequences Doctrine and its Applicability to Emotional Distress Injuries*, 29 Okla. City U. L. Rev. 405, 424-27 (2004)

---

*Garza*, 27 S.W.3d 54, 62-63 (Tex. App. 2000) (discussing mitigation of lost wages, but not mitigation of emotional distress).

(offering several reasons why courts have not adopted a mitigation requirement for emotional distress damages).

SkyWest cites two scholarly sources that predate the 1991 Amendments, but neither deal with the mitigation of emotional distress damages.[11] The McCormick treatise describes the avoidable consequences doctrine broadly, but it does not apply it to mitigating emotional distress. *See* McCormick, Law of Damages 127-128. And, while it discusses mitigating personal injuries, it focuses on treatment of those underlying injuries — not treating the emotional distress itself. *See id.* at 136-137. Still later, McCormick discusses emotional distress damages but does not apply the avoidable consequences doctrine to those damages. *See id.* at 315-319. The same holds true for the Restatement. *See* Restatement (Second) of Torts §§ 905, 918, 924.

The pre-1991 Amendments cases that SkyWest cites also do not show a well-established rule requiring plaintiffs to mitigate emotional distress. One of the federal cases does not discuss emotional distress damages at all.

---

[11] The *SDI* district court decision similarly articulates the common law rule too broadly, relying only on the general duty to mitigate, rather than a duty to mitigate emotional distress. *See* 631 F. Supp. 3d at 420.

*David H. v. Spring Branch Indep. Sch. Dist.*, 569 F. Supp. 1324 (S.D. Tex. 1983) (mitigation of cost for private schooling). Another dealt primarily with whether an intentional infliction of emotional distress claim required the plaintiff to prove his distress was reasonable to prevail.[12] *Chuy v. Phila. Eagles Football Club*, 431 F. Supp. 254, 263 (E.D. Pa. 1977), *aff'd*, 595 F.2d 1265 (3d Cir. 1979) (en banc). Meanwhile, another federal decision and the two pre-1991 Amendments Texas state court decisions focused on mitigation by addressing the plaintiff's underlying physical injury—not steps the plaintiff could have taken to treat his pain and suffering. *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1138-39 (5th Cir. 1985); *Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 447 (Tex. 1967); *Thompson v. Quarles*, 297 S.W.2d 321, 327 (Tex. Civ. App. 1956).

In any event, even if one or two sources SkyWest cites referred with sufficient specificity to a common law rule before Congress enacted the 1991 Amendments, the canon requires more. SkyWest had to show "clear judicial recognition" of its proposed rule. *In re Hanford Nuclear Rsrv. Litig.*,

---

[12] In a footnote, the district court explained that it had also instructed the jury it could consider the plaintiff's delay in acting to disprove the defendant's false statement about his health as mitigation. *Id.* at 263 & n.15.

44

534 F.3d at 1000; *Pasquantino*, 544 U.S. at 363-64. As SkyWest did not do so, the district court did not err in declining to adopt SkyWest's novel instruction.

### C. SkyWest's proposed rule is inconsistent with this Court's precedents and unnecessary to ensure reasonable awards.

SkyWest argues that it "was entitled" to an instruction on the mitigation of emotional distress because, it asserts, Budd "refus[ed] to medicate or seek therapeutic help." Op. Br. at 38. But adopting SkyWest's proposed defense would undermine this Court's longstanding approach to evidence of emotional distress.

This Court has repeatedly held that a plaintiff's testimony, by itself, can be enough to award compensatory damages. *See, e.g.*, *Williams*, 218 F.3d at 486; *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998) ("The evidence of mental anguish testimony in the pending case consisted solely of Migis's testimony."). Consistent with that rule, this Court has accepted testimony about emotional distress without corroborating medical evidence. In *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 300 (5th Cir. 2024), for example, this Court held a plaintiff's testimony about

45

symptoms including "anxiety" and "trouble sleeping" was enough for emotional distress damages.

This Court has found testimony about emotional distress sufficient without considering mitigation. *See, e.g.*, *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488-90 (5th Cir. 2001) (considering failure to mitigate front pay by failing to seek work but not mitigation of emotional distress); *Migis*, 135 F.3d at 1045-47 (same). Indeed, even where testimony discussed medical treatment, this Court has not considered whether plaintiff sought sufficient treatment or followed all treatment plans. *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 832 (5th Cir. 2002) (testimony of plaintiff and his wife about repeatedly visiting doctors); *Forsyth v. City of Dallas, Tex.*, 91 F.3d 769, 774 (5th Cir. 1996) (affirming compensatory damages where one plaintiff testified that she suffered depression and saw a psychologist, and the other testified to depression with no mention of treatment).

SkyWest's proposed rule would undermine those precedents. SkyWest argues that Budd had a duty to continue seeing a psychiatrist, take psychotropic medication, and discuss the harassment with a therapist. Op. Br. at 20-21. To prevail against arguments like these, plaintiffs will need to introduce testimony that they sought sufficient care for their

46

emotional distress, including expert testimony on the efficacy of medication and treatment offered and undertaken. That is fundamentally at odds with the evidence this Court has found sufficient for emotional distress damages.

It is thus no surprise that the overwhelming weight of caselaw after the 1991 Amendments cuts against SkyWest's proposed rule. As of the date of this brief's filing, this Court has decided more than ninety appeals that cite 42 U.S.C. § 1981a, but no party here located one applying a failure-to-mitigate emotional distress defense to Title VII claims. District courts in this circuit have similarly decided over five hundred cases citing 42 U.S.C. § 1981a, and the parties identify only two addressing the issue: the *SDI* decision SkyWest relies on, 631 F. Supp. 3d at 420-22, and the district court here. At the same time, courts around the country have rejected SkyWest's proposed defense. *See, e.g.*, *EEOC v. Chris the Crazy Trader Inc.*, No. 21-CV-02666, 2025 WL 958486, at *8 (D. Colo. Mar. 31, 2025) ("[I]f Congress intended to apply § 2000e-5's mitigation defense to all compensatory damages awards, it would have done so expressly."); *see also Castagna v. Luceno*, 558 F. App'x 19, 22 (2d Cir. 2014); *contrast* 5 Larson on Employment Discrimination § 93.03 (explaining compensatory damages under Title VII

47

without referencing mitigation) *with id.* § 92.08 (discussing mitigation for backpay under Title VII).

Furthermore, rejecting SkyWest's failure-to-mitigate emotional distress requirement does not affect this Court's ability to ensure emotional distress damages are reasonable. The 1991 Amendments and this Court's precedents already provide effective mechanisms to review emotional distress awards.

Congress, of course, explicitly capped the combination of compensatory and punitive damages a plaintiff may receive. 42 U.S.C. § 1981a. And this Court has held that, in doing so, Congress reduced the risk of excessive punitive damages awards. *Abner v. Kansas City S. R. Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (holding that the statute "cabins discretion in the amount of the award in the most direct manner possible — it caps the award"). The same holds true for emotional distress awards. *See, e.g.*, *Harris*, 92 F.4th at 293-94, 299 (considering excessiveness of emotional distress damages already reduced to the statutory cap).

Defendants may also dispute the severity of the emotional distress a Title VII plaintiff suffers without this novel defense. This Court regularly reviews compensatory damages for excessiveness. In doing so, this Court

48

will reduce emotional distress damages awards where the evidence did not support the size of an emotional distress award. *See, e.g.*, *Harris*, 92 F.4th at 300-01 (reducing $300,000 award to $248,619.57); *Giles*, 245 F.3d at 489 (reducing $300,000 award to $150,000). A defendant may also point to "[t]he absence of medical care ... as evidence that the emotional distress was not so severe as to warrant a very large award." 5 Larson on Employment Discrimination § 93.03.

SkyWest did not do that here. Instead, it chose to use evidence of Budd's treatment to attack her credibility on liability issues. *See* ROA.3740-41, 3762-63. The jury did not agree, and it apparently credited Budd's testimony. Based on that testimony, the jury awarded emotional distress damages that are well within the bounds of this Court's past decisions. *See, e.g.*, ROA.1615 (awarding $170,000 for emotional distress); *Giles*, 245 F.3d at 489. SkyWest cannot now argue that award was inconsistent with Title VII or infirm because the court did not use SkyWest's new mitigation instruction.

### III. SkyWest did not show that the jury's punitive damages award should be discarded.

The district court instructed the jury on the punitive damages standard, and the jury concluded that the evidence warranted punitive damages. SkyWest does not challenge the instruction, instead asking this Court to set aside the punitive damages award by overlooking its own failure to preserve its good faith defense and making unwarranted inferences in SkyWest's favor.

### A. Standard of Review

SkyWest suggests the denial of judgment as a matter of law on a Title VII punitive damages award is easier to obtain because courts apply "exacting review" to punitive damages. Op. Br. at 40. That is not the case. Both cases that SkyWest cites involved constitutional challenges to punitive damages awards. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 415-16 (2003) (constitutional challenge to punitive damages of $145,000,000 for tort claim); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 8-9 (1991) (similar). The standard applied in those cases does not apply to Title VII punitive damages awards. *See Abner*, 513 F.3d at 164.

Here, by contrast, the longstanding and deferential standard of review for post-trial challenges to the sufficiency of the evidence applies. "Although [this Court's] review is de novo, [it] recognize[s] that its standard of review with respect to a jury verdict is especially deferential." *Wantou*, 23 F.4th at 431 (citation modified); *id.* at 439-40 (applying standard to punitive damages award).

Under that standard, this Court "consider[s] all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Id.* at 431 (citation modified). The Court "cannot substitute other inferences that [it] might regard as more reasonable." *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc). Nor can it "make credibility determinations" or "weigh evidence," as "those are jury functions, not those of a judge." *Harris*, 92 F.4th at 297 (citation modified). Thus, for SkyWest to prevail, "the facts and inferences [must] point so strongly and overwhelmingly in [its] favor that reasonable jurors could not reach a contrary conclusion." *Wantou*, 23 F.4th at 431 (citation modified).

51

### B. Punitive damages standard

A jury may award punitive damages in a Title VII case when an employer acts "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). This standard does not require "egregious misconduct," or outrageousness. *Kolstad*, 527 U.S. at 535, 538-39. Instead, the plaintiff need only show that the employer acted "in the face of a perceived risk that its actions will violate federal law." *Id.* at 536.

If the plaintiff satisfies this standard, the defendant may only escape punitive damages through a good-faith defense. It must show that "it made good-faith efforts to comply with Title VII." *Boh Bros.*, 731 F.3d at 468. Unlike the "malice or reckless indifference" element, the employer has the burden for this affirmative defense. *Id.*; *see also EEOC v. New Breed Logistics*, 783 F.3d 1057, 1075 (6th Cir. 2015) (discussing "*Kolstad* affirmative defense").

### C. The jury could reasonably infer that SkyWest acted with malice or reckless indifference to Budd's federally protected rights.

The jury only needed to find that one of SkyWest's managers acted with the requisite mental state for punitive damages. *Deffenbaugh-Williams*,

188 F.3d at 285-86; *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 373 (4th Cir. 2008). SkyWest does not dispute that Dallin Hansen, Dustin Widmer, and Kellie Dehais each were managers whose actions could be the basis for its punitive damage liability. *See* Op. Br. at 44-53. But it then fails to apply the appropriate standard, asking the Court to make inferences in SkyWest's favor, rather than in favor of the jury's verdict. Under the appropriate standard, the evidence was more than sufficient for the jury to find any one of these three managers acted with the requisite mental state.

### 1. The jury could find Hansen acted with malice or reckless indifference.

The jury heard evidence that Hansen participated in and witnessed egregious sexual harassment directed at Budd. SkyWest argues that Budd's testimony was uncorroborated, and that the EEOC and Budd did not show he had received training on SkyWest's policies. Op. Br. at 45-46. Neither warrants setting aside the jury's verdict.

Even putting aside corroborating evidence, Budd's testimony was enough for the jury to find Hansen harassed her and witnessed other acts of harassment. In ruling on SkyWest's motion, the district could not make credibility determinations or adverse inferences about the testimony

53

supporting the verdict. *Wantou*, 23 F.4th at 431. And the jury heard Budd

testify that  Hansen repeatedly harassed Budd with sexual comments,

explaining that he asked Budd if she "liked whips and chains and

leathers," and, when others made sexual jokes, "[h]e wouldn't stop them.

He would add to it and get 'em going." ROA.2879-81.

The jury could also infer that Hansen harassed Budd with at least

reckless indifference to Budd's rights because he was a manager and

SkyWest trained its employees and managers on its harassment policy.

*Wantou*, 23 F.4th at 440. SkyWest argues that the EEOC and Budd had to

offer "testimony specific to Hansen," Op. Br. at 46, but that was

unnecessary. As the district court held, a jury could reasonably infer

Hansen received training on SkyWest's policies at least twice because he

was a manager, and the jury heard testimony that "every SkyWest

employee receives computer-based training on sexual harassment policy

'[u]pon hire . . , when their job code changes to a leadership position, ... and

then annually every year after.'" ROA.2774 (quoting ROA.3248); *see also*

*EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 336 (5th Cir. 2012) (holding that jury

could infer knowledge from evidence employer trained managers and that

relevant individual was a manager).

### 2. The jury could find that Widmer acted with malice or reckless indifference.

Widmer's insufficient response to Budd's complaints also was enough to support the jury's punitive damages award. "[R]ecklessness and malice are to be inferred when a manager responsible for ... enforcing policy in the area of discrimination does not respond to complaints, despite knowledge of serious harassment." *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1269 (10th Cir. 2000); *see also Griffin v. Delchamps, Inc.*, No. 98-30318, 1999 WL 155682, at *14 (5th Cir. Mar. 12, 1999) (a jury could find malice or reckless indifference when manager's inadequate response allowed harassment to continue). The jury here could have found that Widmer did exactly that.

Widmer was aware of the prohibitions on sexual harassment and his duty to report complaints of harassment. ROA.3154-56. Budd testified that she told Widmer in September her coworkers "were making sexual comments that were making [her] feel very uncomfortable." ROA.2905. Widmer responded by telling her to "just see how it goes" because "[i]f I do anything it will just put a larger target on your back."ROA.2906. He then did not report or attempt to address her September complaint.

55

ROA.3175. And SkyWest's harassment of Budd continued, unabated, while Budd left Widmer a voicemail in which she was crying and said, "I can't do this." *See* ROA.2910-11, 3076. She testified that Widmer "never returned or acknowledged it." ROA.3076.

SkyWest asks this Court to disbelieve Budd's testimony and believe Widmer instead. But the jury did not have to credit Widmer's version of events. *See Boh Bros.*, 731 F.3d at 452. And the jury could have found, based on testimony from Budd and Widmer, that Widmer knew what sexual harassment was, knew he had a duty to report and respond to complaints of harassment, and did not do so. *See Deters*, 202 F.3d at 1269.

### 3. The jury could find that Dehais acted with malice or reckless indifference.

Dehais's inadequate investigation and discipline similarly supports the jury's punitive damages award. *See Beran v. VSL N. Platte Ct. LLC*, 144 F.4th 1007, 1014 (8th Cir. 2025); *Parker v. Gen. Extrusions, Inc.*, 491 F.3d 596, 604 (6th Cir. 2007). Dehais did not interview relevant witnesses, ask follow-up questions about the harassment, or ask a witness for evidence she identified as showing some of the harassment. ROA.3264-65, 3268, 3273. Then Dehais issued no discipline for any

harassment other than the candy jar incident, for which she imposed minimal discipline — mostly the same level given for tardiness. ROA.3159, 3280-81. She did not discipline Hansen or Widmer, ROA.3983, and she did not recommend discipline for Jim Lusk, though Budd and two other witnesses told her that he "use[d] sexual language in the workplace." ROA.3271. Dehais then did not tell Budd when she finished the investigation, ROA.3281, or provide the training she recommended until three years later. *See* ROA.3277.

SkyWest minimizes these problems with Dehais's investigation and discipline, arguing that the EEOC had to put on evidence "of what a reasonable investigation should consist of." Op. Br. at 51. But courts have upheld punitive damages awards based on a company's insufficient responses to complaints of harassment without reference to expert testimony. *See, e.g.*, *Parker*, 491 F.3d at 605; *Deters*, 202 F.3d at 1269 (same); *see also Wantou*, 23 F.4th at 440 (finding employer did not establish good faith defense based on response to complaint without referring to expert testimony). A jury does not need expert testimony to infer, at minimum, reckless disregard of Budd's federally protected rights from Dehais's insufficient response to Budd's complaints.

SkyWest attempts to sidestep the delayed training and Dehais's failure to notify Budd of the investigation's results, but the jury could consider that evidence. SkyWest argues the years-long delay was irrelevant based on *State Farm*, 538 U.S. at 422 , but *State Farm* is a non-Title VII case that does not involve the *Kolstad* standard. And it held only that it was improper to punish a defendant for "dissimilar acts, independent from the acts upon which liability was premised." *Id.* at 422. SkyWest's three-year delay was neither dissimilar nor independent from its treatment of Budd. Meanwhile, SkyWest argues that the jury could not have considered the lack of notice because Budd had an attorney. But SkyWest does not point to evidence that SkyWest told Budd's lawyer the investigation was complete—or that Dehais could not tell Budd it had ended before May. *See Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 573 (6th Cir. 2019) (holding that employer cannot rely on unsupported assertion that legal department acted instead of human resources).

### D. SkyWest did not preserve its good faith defense or meet the high standard for using the defense to set aside the jury's verdict.

As an initial matter, SkyWest forfeited its good faith defense by failing to raise it in a Rule 50(a) motion. "Any argument made in a renewed

motion for judgment as a matter of law under Rule 50(b) must have been previously made in a motion for judgment as a matter of law under Rule 50(a)." *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016); *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 290 (5th Cir. 2019).

Both at the close of the EEOC's case and at the close of evidence, SkyWest focused on the alleged lack of evidence supporting punitive damages, not its good faith defense. *See* ROA.3374, 3622-23. SkyWest argued below that its references to "prompt remedial measures" preserved its good faith defense, but it made those references in arguing that the EEOC had not met *its* burden to show a basis for punitive damages. *See* ROA.3374.[13] *See Holmes v. Reddoch*, 117 F.4th 309, 318 & n.8 (5th Cir. 2024) (moving for JMOL on plaintiff's claim was insufficient to preserve argument on defendant's qualified immunity).

Even if this Court considers the defense, SkyWest has not shown the evidence would compel a jury to find it acted in good faith. A jury can find

---

[13] SkyWest may also argue it raised its good faith defense at the close of the EEOC's case, but SkyWest conceded below it did not do so. *See* ROA.2717 ("Because it was SkyWest's burden to prove this affirmative defense, it was properly raised at the close of evidence, after SkyWest had presented its evidence in support.").

that an employer did not establish this defense when the employer does not respond appropriately to complaints.[14] Thus, a jury may find against an employer on the defense where "at least certain of [the plaintiff's] complaints were ignored." *Wantou*, 23 F.4th at 440; *cf. Harris*, 92 F.4th at 302 (finding good faith when employer acted "[e]ach time" employee filed complaint). Similarly, the good faith defense may not apply where the employer does not escalate a complaint consistent with its policy. *See Wantou*, 23 F.4th at 440 ("Wantou's ethics complaints were regularly demoted to nonethics"); *EEOC v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 439 (7th Cir. 2012) (managers who received complaints did not "compl[y] with the policy by reporting the harassment to upper management").

A jury may also consider the adequacy of the employer's investigation. It undercuts the defense if an employer does not investigate each claim of discrimination, *see Heaton v. The Weitz Co.*, 534 F.3d 882, 890 (8th Cir. 2008), fails to interview relevant witnesses, *see New Breed Logistics*, 783 F.3d

---

[14] An antidiscrimination policy, by itself, is not enough to establish the defense. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999) ("[E]ncourag[ing] employees to contact higher management with grievances" is not enough); *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 573 (6th Cir. 2019) ("[A] written anti-discrimination policy does not by itself shield an employer from punitive damages").

at 1074, or fails to notify the plaintiff of the results of the investigation. *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004) (emphasizing the negative effects that follow from "the general failure to communicate the results of investigations"). And a jury can consider the adequacy of the discipline imposed. *Id.* (holding that a warning that a "remark could be taken out of context" was insufficient); *Parker*, 491 F.3d at 603 (considering harasser "not ultimately punished for sexual harassment, but instead ... written up for the relatively minor offense of 'horseplay'").

The jury here heard evidence that SkyWest's response failed on all these fronts. As explained above, Widmer did not report Budd's first complaints to upper management. *See* ROA.3175. Dehais, meanwhile, did not interview witnesses Budd identified, including at least one harasser, ask follow-up questions when an interviewee said she heard "sex talk," and did not ask for photographs of the harassment. *See* ROA.3263-65, 3268, 3273, 3289-90. Instead, Dehais "randomly selected" who to interview. ROA.3267. The jury could consider the lenient reprimands given to employees, ROA.3159, 3280-81, as well as Dehais's failure to reprimand to Jim Lusk and Avalo's testimony that he never received a reprimand.

61

ROA.3218, 3271. And the jury could consider Budd's testimony that SkyWest did not tell her when it finished the investigation, ROA.2381, as well as the multiyear delay in implementing the remedial training. *See* ROA.3276.

The jury could and did make reasonable inferences from the evidence above that SkyWest did not act in good faith. And, contrary to SkyWest's assertions, it did not require expert evidence to do so. *See Wantou*, 23 F.4th at 440. Thus, while SkyWest disagrees with the jury's conclusion, it has not shown that "the facts and inferences point so strongly and overwhelmingly in [it's] favor that reasonable jurors could not reach a contrary conclusion." *Wantou*, 23 F.4th at 431.

## CONCLUSION

For all these reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

CATHERINE ESCHBACH
Acting General Counsel

CHRISTOPHER LAGE
Deputy General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

s/ James Driscoll-MacEachron
JAMES DRISCOLL-MACEACHRON
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(602) 661-0014
james.driscoll-maceachron@eeoc.gov

December 17, 2025

**Certificate of Compliance**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 12,395 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word with Palatino Linotype 14 point.

s/ *James Driscoll-MacEachron*
James Driscoll-MacEachron
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(602) 661-0014
james.driscoll-maceachron@eeoc.gov

Dated: December 17, 2025

## CERTIFICATE OF SERVICE

I certify that on this 17th day of December, 2025, I electronically filed the foregoing brief in PDF format with the Clerk of Court via the appellate CM/ECF system. I certify that all counsel of record are registered CM/ECF users, and service will be accomplished via the appellate CM/ECF system.

s/ *James Driscoll-MacEachron*
James Driscoll-MacEachron
Attorney
Equal Employment
Opportunity Commission
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
(602) 661-0014
james.driscoll-maceachron@eeoc.gov

Dated: December 17, 2025